## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK HUDSON, on behalf of himself and other persons similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 18 C 4620 |
| v. | ) ) | Judge Sara L. Ellis |
| RALPH LAUREN CORPORATION, RALPH LAUREN RETAIL, INC., and VIBES MEDIA, LLC, | ) ) ) ) | |
| Defendants. | ) | |

## <u>OPINION AND ORDER</u>

Plaintiff Patrick Hudson received approximately 188 text messages from Defendants Ralph Lauren Corporation and Ralph Lauren Retail, Inc. (collectively, "Ralph Lauren"), and Ralph Lauren's marketing company, Vibes Media, LLC ("Vibes"). Hudson thereafter filed this putative class action lawsuit against Defendants for violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, claiming that Defendants violated the TCPA by sending him text messages using an automatic telephone dialing system ("ATDS") without his express consent and by failing to include opt-out instructions in each message. Defendants have filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court finds that the first amended complaint does not conclusively establish the existence of prior express consent to receive the number of messages Defendants sent Hudson and that Hudson has sufficiently alleged the use of an ATDS. But because the TCPA and its regulations do not provide a basis for Hudson's claim for failure to include opt-out instructions in each text message, Hudson cannot pursue this aspect of his TCPA claim.

## BACKGROUND[1]

Ralph Lauren works with Vibes, a marketing company, to promote the Ralph Lauren retail and clothing brand through advertising and promotional campaigns sent to consumers through their mobile devices. Ralph Lauren enlisted Vibes to create a customized software platform and text messaging campaign.

On May 17, 2015, Hudson received a message from Defendants, through the short message service ("SMS") shortcode 894-48,[2] which stated:

> PoloFactoryStores: Reply Y to get automated offers & ads. Consent is not a condition of purchase. Up to 6 alert msgs/mo.Msg&DataRatesMayApply.Rply STOP to end.

Doc. 34 ¶ 14. Hudson replied "Y." *Id.* ¶ 15. Defendants proceeded to send Hudson more than six messages a month, all from the same 894-48 SMS code. For example, in July 2016, Defendants sent Hudson ten text messages, and, in July 2017, Defendants sent him eight text messages. In total, he received at least thirty-two messages over the monthly limits to which he consented. Out of the approximately 188 text messages Hudson received from Defendants, eighty percent did not include instructions as to how to stop receiving the messages. All of the text messages marketed Ralph Lauren's products, and none addressed Hudson by name. Defendants sent similar text messages to other individuals as well.

---

[1] The facts in the background section are taken from Hudson's first amended complaint and are presumed true for the purpose of resolving Defendants' motion to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007). Defendants have provided a declaration from Jennifer Zanella, a Vibes employee, which attaches the text messages exchanged between Hudson and Defendants. Hudson does not object to the Court's consideration of these exhibits in deciding the motion to dismiss, and the Court finds doing so appropriate because Hudson refers to the text messages in his first amended complaint and they are central to his claim. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009).

[2] This SMS shortcode is assigned to Ralph Lauren.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).  To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

**ANALYSIS**

The TCPA prohibits the use of an ATDS to call or send text messages to cellular telephones without the recipient's prior express consent.  47 U.S.C. § 227(b)(1)(A)(iii); *see In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 Order"), 18 FCC Rcd. 14014, 14115 ¶ 165 (2003) (TCPA applies to both "voice calls and text calls to wireless numbers");[3] *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1009 (N.D. Ill. 2010) ("[T]he Court agrees with the FCC's interpretation that § 227 of the TCPA applies to text messages.").

---

[3] Although the Supreme Court is currently considering the issue of whether the Hobbs Act requires district courts to defer to the FCC's legal interpretations of the TCPA, *see Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, No. 17-1705 (argued Mar. 25, 2019), at this time, the FCC's final orders bind the Court under the Hobbs Act, *see CE Design Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446–50 (7th Cir. 2010).

## I.     Prior Express Consent

Defendants first argue that Hudson's claim fails because he admits that he provided prior express consent for Defendants to contact him and that the message to which he replied did not limit the consent in any way.  Defendants claim Hudson may have a breach of contract claim for any additional messages he received each month, but not a TCPA claim.  Hudson responds, however, that he provided only limited consent to the receipt of text messages, with Defendants having exceeded the scope of consent with respect to the thirty-two messages they sent above the six-message monthly limit.  Consent is an affirmative defense on which Defendants bear the burden of proof, with dismissal warranted only if Hudson has pleaded himself out of court by alleging all the elements of the defense in his complaint.  *See Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 734 (N.D. Ill. 2014) (defendant bears the burden of establishing the affirmative defense of express consent, with a court able to dismiss a suit on the basis of such a defense only if it is obvious on the face of the complaint); *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 905 (N.D. Ill. 2012) (collecting cases noting that express consent is not an element of a plaintiff's TCPA prima facie case).

Here, the Court cannot conclude that Hudson has pleaded himself out of court on the issue of consent.  The "scope of the consent must be determined upon the facts of each situation."  *In re GroupMe, Inc./Skype Comm'cns S.A.R.L. Petition for Expedited Declaratory Ruling*, 29 FCC Rcd. 3442, 3446 ¶ 11 (2014); *Blow v. Bijora, Inc.*, 855 F.3d 793, 805 (7th Cir. 2017) (acknowledging that consent may be limited in scope but concluding that plaintiff's provision of a cell number "for a VIP discount card and later texting directly to opt in to the text club amount to express consent to texts about [store] discounts, in-store promotions, and special events"); *Zeidel v. YM LLC USA*, No. 13-cv-6989, 2015 WL 1910456, at *3 (N.D. Ill. Apr. 27,

4

2015) ("[C]onsent is limited in scope to the purpose for which it was originally granted. . . . [S]imply providing one's phone number does not constitute *carte blanche* consent to receive automated marketing messages of any kind[.]"); *Kolinek v. Walgreen Co.*, No. 13 C 4806, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014) ("[T]he scope of a consumer's consent depends on its context and the purpose for which it is given. Consent for one purpose does not equate to consent for all purposes."). Typically, courts consider the scope of consent based on the type of calls or messages that a plaintiff receives. *See Payton v. Kale Realty, LLC*, 164 F. Supp. 3d 1050, 1065 (N.D. Ill. 2016) ("[T]he initial reason for disclosing Payton's cellular number to Kale was to engage in discussions of developing a business relationship, and the text message received approximately two years after merged discussions had ended also related to developing a business relationship, albeit a different type of business relationship[.]"); *Toney*, 75 F. Supp. 3d at 735–37 (in providing phone number for questions about a merchandise order, plaintiff did not consent to calls offering membership services of another party); *Kolinek*, 2014 WL 3056813, at *4 (court could not find on motion to dismiss that calls were within scope of consent where plaintiff initially gave phone number for identity verification purposes and then received calls reminding him to refill his prescription).

Here, Hudson contends that Defendants exceeded the scope of his consent by sending him more than six texts in certain months, despite his express agreement to only receive "[u]p to 6 alert msgs/mo." Doc. 34 ¶ 14. Defendants claim that this specification of a numerical threshold did not limit Hudson's consent, but they cite nothing to support such an expansive interpretation of consent. *Cf. Zeidel*, 2015 WL 1910456, at *3 ("[C]onsent is limited by the facts surrounding the consent, including the terms of the telemarketer's sales pitch."). At least one recent case expressly disagreed with Defendants' position, concluding that the defendant

5

exceeded the scope of the plaintiff's consent because the plaintiff agreed to receive up to three messages per week and the defendant sent the plaintiff more than three text messages over two separate seven-day periods. *Oliver v. Men's Wearhouse*, No. CV 16-01100 TJH (ASx), 2017 WL 6888490, at *3 (C.D. Cal. Dec. 6, 2017). The situation in *Oliver* mirrors that presented here. Because Hudson's first amended complaint does not preclude a finding that he did not consent to all the messages Defendants sent, the Court cannot dismiss Hudson's TCPA claim on the basis of prior express consent at this stage.[4]

## II. Use of an ATDS

Defendants also argue that Hudson has failed to plausibly allege that Defendants used an ATDS to send text messages to his phone. The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). In 2003, 2008, and 2015, the FCC issued interpretations of what constitutes an ATDS. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2015 Order"), 30 FCC Rcd. 7961 (2015); *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2008 Order"), 23 FCC Rcd. 559 (2008); 2003 Order, 18 FCC Rcd. 14014. In *ACA International v. FCC*, the D.C. Circuit reviewed the FCC's 2015 Order and "set aside the [FCC's] explanation of which devices qualify as an ATDS." 885 F.3d 687, 695 (D.C. Cir.

---

[4] Defendants also argue that allowing a plaintiff to recover statutory damages under the TCPA in such a situation, where a plaintiff has provided prior express written consent but not revoked it, would violate Defendants' due process rights and can only amount to a breach of contract. But Defendants' arguments rest on their interpretation of Hudson's consent, claiming that it had no limits despite language suggesting the contrary. As a result of the limiting language, the Court has found that Hudson has plausibly alleged that Defendants exceeded the scope of Hudson's consent, thus potentially exposing Defendants to TCPA liability for those messages that exceeded the scope of his consent. Therefore, the Court need not reach the due process or breach of contract arguments at this time. The Court also does not find Hudson waived his TCPA claim where he arguably addressed both the breach of contract and due process arguments together. *See* Doc. 45 at 4.

6

2018); *id.* at 703 (noting the "unreasonableness of the Commission's expansive understanding of when a device has the 'capacity' to perform the necessary functions"). *ACA International* is binding on this Court. *See Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 932 (N.D. Ill. 2018). Although it set aside the 2015 Order as it related to the definition of an ATDS, the D.C. Circuit declined to set forth a definitive definition of an ATDS. *See ACA Int'l*, 885 F.3d at 702–03 (noting that it "might be permissible for the Commission to adopt either interpretation"—that "a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed" or that it qualify "even if it lacks that capacity"). After *ACA International*, courts have split on the proper definition for an ATDS and whether *ACA International* invalidated the FCC's prior 2003 and 2008 interpretations of an ATDS or left those intact. Several courts in this district have concluded that *ACA International* invalidated both the 2003 and 2008 Orders with respect to the ATDS definition, which means the court determines the proper definition of an ATDS in the first instance. *See Gadelhak v. AT&T Servs., Inc.*, No. 17-cv-01559, 2019 WL 1429346, at *4 (N.D. Ill. Mar. 29, 2019); *Johnson v. Yahoo!, Inc.*, 346 F. Supp. 3d 1159, 1161–62 (N.D. Ill. 2018); *Pinkus*, 319 F. Supp. 3d at 934–37. *But see Maes v. Charter Commc'n*, 345 F. Supp. 3d 1064, 1068–69 (W.D. Wis. 2018) (concluding that *ACA International*'s analysis was limited to the 2015 Order, leaving the 2003 and 2008 Orders in place).

Defendants urge the Court to adopt the *Pinkus* court's definition of an ATDS, specifically that "an ATDS must have the capacity to generate telephone phone numbers, either randomly or sequentially, and then to dial those numbers." 319 F. Supp. 3d at 938. Although Hudson disagrees with that definition, he argues he has stated a claim regardless of the definition the Court adopts. The Court agrees because, even under Defendants' proposed narrow definition of an ATDS, Hudson's allegations do not foreclose the use of an ATDS.

7

Using the *Pinkus* definition, to qualify as an ATDS, the defendant need not have deployed the device's capacity to generate telephone numbers randomly or sequentially as long as the device has the present ability to do so. *Id.* at 939 ("[T]he best reading of 47 U.S.C. § 227(a)(1) requires that an ATDS have the capacity to generate numbers randomly or sequentially and then to dial them, even if that capacity is not deployed for practical reasons."); *see also King v. Time Warner Cable Inc.*, 894 F.3d 473, 479 (2d Cir. 2018) (defining an ATDS as "a device that currently has features that enable it to perform the functions of an autodialer— whether or not those features are actually in use during the offending call"). In *Pinkus*, the plaintiff "concede[d] that his complaint [did] not plausibly allege that he was called with a device that has the capacity to store or produce numbers that have been randomly or sequentially generated." *Id.* at 931, 939. Here, however, Hudson alleges that "Defendants used equipment with the ability to store or produce cellular telephone numbers to be called using a random or sequential number generator and to dial such numbers without human intervention," as evidenced by "the high volume of text messages, the generic and impersonal nature of the messages, and Defendants' use of an SMS code." Doc. 34 ¶¶ 37–38. These allegations sufficiently suggest the use of an ATDS at the motion to dismiss stage, even after *ACA International*. *See Yates v. Checkers Drive-In Rests., Inc.*, No. 17-cv-9219, 2019 WL 1437906, at *2 (N.D. Ill. Apr. 1, 2019) (allowing complaint to proceed after *ACA International* where plaintiff alleged that defendants used equipment with "the capacity to store, produce, and dial random and sequential numbers"); *Amodeo v. Grubhub Inc.*, No. 1:17-cv-1284, Doc. 55 at 3–4 (N.D. Ill. Feb. 21, 2019) (finding allegations of an ATDS sufficient, "irrespective of whether *ACA Int'l* invalidated the 2003 Order and 2008 Declaratory Ruling," and noting that "[d]ue to the early phase of this litigation, the Court is not yet apprised of the type of equipment Defendant is

using or the technical capacity of Defendant's equipment"). Hudson has not relied only on legal boilerplate to suggest use of an ATDS but has also included allegations of the generic nature of the messages, the use of an SMS shortcode, and the fact that others received the same messages. *See Izsak v. Draftkings, Inc.*, 191 F. Supp. 3d 900, 904 (N.D. Ill. 2016) ("[T]he complaint must include at least some facts to support the conclusion that an ATDS was used. For example, a plaintiff could describe the promotional content or the generic, impersonal nature of the text message allegedly sent using an ATDS. A plaintiff might also allege that identical messages were sent to many potential customers at the same time."); *Abbas v. Selling Source, LLC*, No. 09 CV 3413, 2009 WL 4884471, at *3 (N.D. Ill. Dec. 14, 2009) (allegations of use of SMS shortcode allowed the inference that defendant used an ATDS to send messages).

Defendants argue that Hudson need allege more to demonstrate the device could generate random or sequential numbers after *ACA International*. But Defendants do not provide any basis for raising the pleading standard for an ATDS and instead rely on distinguishable cases. For example, as already noted, in *Pinkus*, the only cited post-*ACA International* case decided at the pleading stage, the plaintiff conceded that the device did not have the required capacity. *See Pinkus*, 319 F. Supp. 3d at 939. The Court acknowledges that Hudson will have to provide additional evidence on the functionalities of the device at summary judgment. *See Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018) (reviewing summary judgment decision and finding that plaintiff could not point to any evidence suggesting that the device at issue "had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers"); *Johnson*, 346 F. Supp. 3d at 1162 (reconsidering summary judgment decision after *ACA International* and finding system did not qualify as an ATDS where it "did not have the capacity to generate random or sequential numbers to be dialed—it dialed

9

numbers from a stored list").  But at the motion to dismiss stage, Hudson need not include such specific allegations about the type of machine Defendants used, particularly considering that plaintiffs do not typically have access to details of the type of machine used before engaging in discovery.  *See Hayes v. Receivables Performance Mgmt., LLC*, No. 17-cv-1239, 2018 WL 4616309, at *7 & n.4 (N.D. Ill. Sept. 26, 2018) (rejecting argument that plaintiff need allege that "the system used to make the call(s) in question had the specific characteristics of an ATDS listed in § 227(a) to survive a motion to dismiss," noting that the cases the defendant relied on were decided at the summary judgment stage); *Izsak*, 191 F. Supp. 3d at 904 ("[A] TCPA plaintiff should not be expected to plead details regarding the technical functionality of the alleged ATDS[.]"); *Torres v. Nat'l Enter. Sys.*, No. 12 C 2267, 2012 WL 3245520, at *3 (N.D. Ill. Aug. 7, 2012) (requiring the plaintiff to include details of the device at the pleading stage would make defendants "virtually immune to TCPA claims, which clearly is not what was intended by Congress in creating the TCPA").

Defendants also argue that, because Hudson has alleged he consented to receipt of messages from Defendants, the Court cannot find that the device used to send him messages qualifies as an ATDS.  This allegation, according to Defendants, means that Defendants used a set list of numbers to message him, with the capacity to store such numbers no longer sufficient for a device to qualify as an ATDS.  *See Pinkus*, 319 F. Supp. 3d at 936–39 (concluding that predictive dialers do not qualify as ATDSs after *ACA International*).  Defendants' argument essentially asks the Court to read the word "capacity" out of the definition of an ATDS, but nothing supports this view.  Even under the narrow interpretation of an ATDS used in *Pinkus*, as long as the device has the present capacity to generate random or sequential numbers, the fact that Defendants did not use the device in that manner does not prevent it from qualifying as an

ATDS. *See King*, 894 F.3d at 480 ("[T]he TCPA applies to calls from a device that *can* perform

the functions of an autodialer, regardless of whether it has actually done so in a particular

case."); *Pinkus*, 319 F. Supp. 3d at 939 (a device may qualify as an ATDS even if the capacity to

generate numbers randomly or sequentially and then dial them "is not deployed for practical

reasons"). At this stage, the Court finds that Hudson has sufficiently alleged that the device

Defendants used had the required capacity. Defendants can renew their challenge to the use of

an ATDS after the parties have engaged in discovery.

## III. Failure to Include Opt-Out Instructions in Each Text Message

Hudson also brings a claim for Defendants' failure to include instructions on how to stop

receiving Ralph Lauren advertisements in every text message that Defendants sent, allegedly

violating 47 U.S.C. § 227(c)(1) and 47 C.F.R. § 64.1200(b)(3). 47 C.F.R. § 64.1200(b)(3)

provides:

> All artificial or prerecorded voice telephone messages shall:
>
> . . .
>
> In every case where the artificial or prerecorded voice telephone
> message includes or introduces an advertisement or constitutes
> telemarketing and is delivered to a residential telephone line or any
> of the lines or telephone numbers described in paragraphs (a)(1)(i)
> through (iii), provide an automated, interactive voice- and/or key
> press-activated opt-out mechanism for the called person to make a
> do-not-call request, including brief explanatory instructions on
> how to use such mechanism, within two (2) seconds of providing
> the identification information required in paragraph (b)(1) of this
> section. When the called person elects to opt out using such
> mechanism, the mechanism, must automatically record the called
> person's number to the seller's do-not-call list and immediately
> terminate the call. When the artificial or prerecorded voice
> telephone message is left on an answering machine or a voice mail
> service, such message must also provide a toll free number that
> enables the called person to call back at a later time and connect
> directly to the automated, interactive voice- and/or key press-
> activated opt-out mechanism and automatically record the called
> person's number to the seller's do-not-call list.

47 C.F.R. § 64.1200(b)(3). Defendants argue that these opt-out requirements only apply to artificial or prerecorded voice messages, meaning no basis exists to find a TCPA violation for the failure to include opt-out instructions in each text message Hudson received. Defendants recognize that, for purposes of the TCPA, the term "call" encompasses both voice calls and text messages. *See* 2003 Order, 18 FCC Rcd. at 14115 ¶ 165 (TCPA applies to both "voice calls and text calls to wireless numbers"). But they argue that this equivalence does not carry over to the use of "voice telephone message" in § 64.1200(b)(3).

The Seventh Circuit has not addressed this question,[5] and the Court's research has revealed a dearth of caselaw on the issue. But recently, another court in this district considered the same issue and agreed with Defendants, noting that the plaintiff had not offered "any legal authority establishing that the requirements of 47 C.F.R. § 64.1200(b)(3) are applicable to text messages absent administrative action." *Yates*, 2019 WL 1437906, at *3. *Yates* cited to *Reese v. Marketron Broadcast Solutions, Inc.*, in which the court relied on the plain language of § 64.1200(b)(3) to conclude that a plaintiff could not state a claim for the lack of opt-out instructions in text messages because § 64.1200(b)(3) only applies to "artificial or prerecorded voice telephone message[s]." No. 18-1982, 2018 WL 2117241, at *6 (E.D. La. May 8, 2018). Two other decisions suggest the opposite, however, although neither addressed the question directly. *See Liotta v. Wolford Boutiques, LLC*, No. 1:16-cv-4634-WSD, 2017 WL 1178083, at *4 (N.D. Ga. Mar. 30, 2017) (addressing whether the plaintiff had Article III standing to pursue a claim for the failure to include opt-out instructions in text messages and equating a text message with § 64.1200(b)(3)'s voice telephone messages); *Epps v. Earth Fare, Inc.*, No. CV 16-08221

---

[5] The Seventh Circuit did consider a TCPA case where only three of the sixty text messages the plaintiff received included opt-out instructions. *See Blow*, 855 F.3d at 803–04. But the Seventh Circuit did not have before it a claim for failure to include opt-out instructions and so did not have occasion to address the issue presented here. *Id.*

SJO (SSx), 2017 WL 1424637, at *5 n.5 (C.D. Cal. Feb. 27, 2017) (in considering the revocation of plaintiff's consent, rejecting the argument that the FCC's "requirement of an automated, interactive opt-out mechanism is limited to 'autodialed or prerecorded telemarketing calls,' and not automated text messages").

Defendants claim that the FCC has agreed with their interpretation that § 64.1200(b)(3) applies only to voice messages, citing *In the Matter of Cargo Airline Association Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991* ("*Cargo Airline*"), 29 FCC Rcd. 3432 (2014). In *Cargo Airline*, the FCC created an exemption from the TCPA for package delivery notifications, with the exemption conditioned on the delivery notifications—either voicemails or text messages—including an opt-out instruction.[6] *Id.* at 3438 ¶ 18 ("[E]ach notification must include information on how to opt out of future delivery notifications; . . . text notifications must include the ability for the recipient to opt out by replying 'STOP.'"). This specific condition for package delivery notifications is similar to the FCC's imposition of opt-out requirements for other specific categories of cases—certain healthcare messages and debt servicing calls. *See Bailey v. CVS Pharm., Inc.*, No. 17-cv-11482(PGS)(LHG), 2018 WL 3866701, at *4–5 (D.N.J. Aug. 14, 2018) (discussing the FCC's "Exigent Healthcare Treatment Exemption," which requires both voice calls and text messages regarding healthcare treatment to include an opt-out notification); *In re Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2016 Order"), 31 FCC Rcd. 9074, 9092 ¶ 40 (2016) (requiring text messages related to debt servicing to "disclose the right [to opt-out] within each text message or in a separate text message that contains only the

---

[6] In *Cargo Airline*, the FCC did note that § 64.1200(b)(3) "requir[es], among other things, that prerecorded telemarketing messages left as a voicemail provide a toll-free call-back number for opt-out purposes." 29 FCC Rcd. at 3437 n.45. The FCC did not discuss whether § 64.1200(b)(3) encompasses text messages.

disclosure and is sent immediately preceding the first covered text message"). These FCC rulings, however, do not extend to all text messages.[7] Instead, because the plain language of § 64.1200(b)(3) encompasses only voice telephone messages and Hudson identifies no other basis for imposing an opt-out requirement with respect to every text message Defendants sent Hudson, he cannot pursue a claim for violation of 47 U.S.C. § 227(c)(1) and 47 C.F.R. § 64.1200(b)(3) based on the lack of such information in each text message he received. *See Yates*, 2019 WL 1437906, at *3; *Reese*, 2018 WL 2117241, at *6.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [42]. The Court dismisses Hudson's TCPA claim based on Defendants' failure to include opt-out instructions in each text message sent to Hudson with prejudice.


Dated: May 1, 2019

_____
SARA L. ELLIS
United States District Judge

---

[7] Indeed, the 2016 Order addressing text messages related to debt servicing suggest that the sender need not include opt-out information in every text message but rather may do so in a separate message before "the first covered text message," undermining Hudson's argument that the TCPA requires notification in every text message. *See* 2016 Order, 31 FCC Rcd. at 9092 ¶ 40.